**STATE of Tennessee, Appellee,**

v.

**Herschel KINNAIRD, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

July 26, 1991.

Permission to Appeal Denied by Supreme Court Dec. 2, 1991.

Lionel R. Barrett, Jr., John G. Oliva, Paul G. Whetstone, Nashville, for appellant.

Charles W. Burson, Atty. Gen., Merrilyn Feirman, Asst. Atty. Gen., Nashville, William E. Gibson, Dist. Atty. Gen., H. Marshall Judd, Marsha L. Selecman, Jere L. Hargrove, Asst. Dist. Attys. Gen., Cookeville, for appellee.

## OPINION

BIRCH, Judge.

A Putnam County jury found Herschel Kinnaird, the defendant, guilty of accessory before the fact to first-degree murder [1] and of conspiracy to commit first-degree murder.[2] For the accessory to first-degree murder conviction, the jury imposed punishment of imprisonment for life. The trial judge sentenced the defendant to a ten-year term for conspiracy to commit first-degree murder, to be served concurrently with the life sentence.

Kinnaird appeals as a matter of right and maintains that the evidence is, as a matter of law, insufficient to support the conviction. Additionally, he contends that:

1. The district attorney general's failure to disclose the existence of a relationship between the state and a juror deprived the defendant of a fair and impartial trial;

2. The district attorney general's failure to disclose certain exculpatory evidence deprived the defendant of a fair and impartial trial;

3. The trial court erred in failing to grant defendant's motion for a mistrial;

4. The trial court erred in permitting a witness to testify about bruises and scratches on the victim; and

5. The trial court erred in his ruling on the discoverability of certain recordings of telephone conversations.

The trial court's judgment is affirmed.

I

The salient proof of record established that the marriage of Pamela and Herschel Kinnaird was an extremely troubled one. After much vacillation, Mrs. Kinnaird decided in March 1988 to proceed with her divorce plans. With this in mind, she retained counsel. A petition was prepared, but not filed.

---

1. Tenn.Code Ann. § 39–1–301, –302 (1982).

2. Tenn.Code Ann. § 39–1–604 (1982).

From all indications, the defendant believed that Gary Hunter was romantically involved with Pamala Kinnaird. Additionally, he often complained that she was not a good mother because she did not prepare meals for their children.

Beginning in the spring of 1988, the defendant, or someone acting in his behalf, began to search for someone to kill Mrs. Kinnaird. The first procurement effort occurred when Earl Kinnaird, the defendant's brother, approached his friend, Kelly Averitt. Earl Kinnaird told Averitt that his brother was interested in finding someone who would murder for hire. Averitt replied that he did not know of anyone.

Shortly thereafter, the defendant himself approached Averitt and asked him to find someone to kill Pamala Kinnaird and make it look like an accident. He told Averitt that "if everything worked out we all could be doing pretty good because of the insurance policy." Although Averitt rejected the request, he did sell a .25 caliber semi-automatic pistol to the defendant.

Another attempted procurement occurred on July 8, 1988, at a residence where the defendant was installing aluminum siding. The defendant asked Jonathan B. Kaye, the owner of the residence, if he knew of someone who would kill for pay, stating that he needed the information for a friend. Kaye's response was emphatically negative. On the previous day, the defendant remarked to Kaye's wife that the next time he got married he wanted to make sure that his wife could cook.

David Barlow was the defendant's job supervisor. As he was inspecting the work on the Kaye residence, the defendant asked him if he knew someone who would kill for hire. He stated to Barlow, as he had to Kaye, that he needed the information for a friend. Barlow dismissed the conversation.

The next solicitation involved Renee Valentine, who at the time was a friend of Earl Kinnaird. The conversation between the defendant and Valentine culminated with the defendant offering her $3,000 to $4,000 to do the job herself. Moreover, the defendant discussed how the murder should be accomplished; he said that he preferred the murder to be done with a knife because he did not want Pamala to suffer. Valentine declined the offer.

Donnie Nelson, the defendant's uncle, testified that the defendant asked him to kill Mrs. Kinnaird for $3,000. The defendant gave Nelson the .25 caliber pistol he had purchased from Averitt. On July 13, 1988, just hours before the killing, the defendant informed Nelson of Mrs. Kinnaird's likely whereabouts. Nelson located her where the defendant had directed him and stabbed her to death.

Mrs. Kinnaird's body was found in her parked car. She had been stabbed with a knife approximately twenty-one times in the face, neck, shoulders, chest, and both hands. Additionally, the knife punctured her right mammary artery, right lung, and liver. Charles Harlan, M.D., Chief Medical Examiner for the State of Tennessee, testified that the victim died from excessive loss of blood.

After Earl Kinnaird had been told of the victim's death, he went to his apartment and found Nelson sitting in his car in the driveway. Desiring to protect his uncle, Earl Kinnaird told Nelson to follow him to a highway rest area, where they abandoned Nelson's car.

On the morning after the victim's death, the defendant asked Averitt to take Nelson, who was then at Earl Kinnaird's apartment, to Nashville. The defendant expressed strong disapproval of Nelson's method of killing the victim; threatening to kill Nelson for cutting her up like he did. The defendant also told Averitt to tell Nelson to leave a note saying that he (Nelson) was to blame for the killing and that he killed Pamala Kinnaird because he was in love with her. The defendant gave Averitt $100 to give to Nelson.

Averitt took the money to Nelson and helped him write the requested note. Averitt then started to drive Nelson to Nashville; en route, however, Nelson insisted that the defendant should pay him, as promised, before he (Nelson) left town. Averitt dropped Nelson off at an exit with the understanding that Averitt would re-

turn with the money. Nelson ended up in Gordonsville. He was arrested there and returned to Cookeville, where he confessed to having killed Pamala Kinnaird.

In a search of the defendant's residence, investigators recovered two policies of insurance. The policies insured Pamala Kinnaird's life; both were in effect at the time of her death. One policy, issued on July 25, 1988,[3] was in the face amount of $100,-000 with Herschel Kinnaird as the sole beneficiary. On the second policy, also insuring the life of Pamala Kinnaird, the defendant collected $34,713.84 on August 22, 1988.

The defendant argues that the evidence does not support his convictions. This argument is two-pronged: First, defendant insists that the trial judge erred in refusing to grant his motion for judgment of acquittal. Inasmuch as the defendant elected to present evidence of his own, any error resulting from a failure to sustain his motion for judgment of acquittal is waived. *State v. Johnson*, 762 S.W.2d 110 (Tenn.1988). Second, the defendant urges that the jury verdict is not supported by the evidence. The appropriate standard for sufficiency review is whether, after viewing the evidence in a light most favorable to the state, any rational trier of fact could have found the essential elements of these offenses beyond a reasonable doubt. Tenn.R.App.P. 13; *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ On appeal, a guilty verdict approved by the trial judge, accredits the testimony of the witnesses for the state. *State v. Hatchett*, 560 S.W.2d 627 (Tenn. 1978). The state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832 (Tenn.1978). Where the sufficiency of evidence is challenged, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt. *State v. Williams*, 657 S.W.2d 405 (Tenn.1983); Tenn.R.App.P. 13(e).

■ From our review of all the evidence, we are satisfied that the proof of record establishes beyond a reasonable doubt the defendant's guilt of accessory before the fact of first-degree murder and of conspiracy to commit first-degree murder.

## II

The defendant alleges that the jury foreman, David Bowman, had testified for the state in a separate criminal proceeding against Thomas Ralph, a witness for Kinnaird in the instant case. The contention is that the state failed to disclose this fact, thereby depriving the defendant of a fair trial.

Other than the allegations pleaded, no proof of such a relationship appears of record, and we are without a factual basis to properly consider this issue.

## III

The defendant alleges that the state knew of a witness who had observed a bearded man stab the victim. The defendant is not bearded, and he contends that this evidence is exculpatory and should have been disclosed to him.

As in the preceding issue, the record before us contains nothing by way of testimony concerning this alleged statement. For the reasons stated in the preceding issue, we are unable to address this issue.

## IV

■ The defendant insists that the trial court should have granted his motion for a mistrial made following the state's efforts to elicit testimony from Detective Robert A. Lynch concerning defendant's escape from jail. The trial court found the testimony incompetent because Lynch lacked first-hand knowledge about the escape.

---

**3.** The application for this policy was dated June 18, 1988. Although "issued" on July 25, 1988, some twelve days after Mrs. Kinnaird's death, the policy took effect on the date of the application.

The trial court followed its ruling with a curative instruction:

> THE COURT: Ladies and gentlemen, before you all went out, there was testimony about an escape. Disregard that testimony. It's not properly before you at this time and I would like to ask you just to put that out of your mind.

Clearly, evidence of defendant's escape had probative value, but the method by which the state attempted to introduce it prompted the defendant's objection. Subsequently and without objection, the state introduced this evidence through a different witness. This issue is without merit.

## V

■ The defendant next contends that the trial court erred in permitting a witness to testify that he observed bruises and scratches on Pamala Kinnaird before she was killed. This testimony evolved during a jury-out hearing, at the conclusion of which the court ruled that the witness could testify as to any observable injuries on the victim. With the jury present, defendant's counsel adduced subsequent testimony about bruises and scratches as he cross-examined the witness:

> Q: Mr. Hunter, if I am correct, I believe you only saw Pam Kinard [sic] with some scratches on her neck, and maybe a small bruise about here [sic] face on one occasion, is that correct?
>
> A: Right.

In this regard, the defendant is hardly in a position to argue that he was unfairly prejudiced by the introduction of this evidence. For in light of the massive amount of incriminating evidence arrayed against him, proof of observable injuries on the victim prior to her death was, at best, a matter of slightest significance.

## VI

■ At trial, immediately prior to the state's direct examination of Renee Valentine, the defendant complained that two recorded telephone conversations between Earl Kinnaird and Renee Valentine should have been discoverable prior to trial under Tennessee Rules of Criminal Procedure 16(a)(1)(C):

> Upon request of the defendant, the State shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the State, and which are material to the preparation of his defense or are intended for use by the State as evidence in chief at the trial, or were obtained from or belong to the defendant.

The trial judge was reluctant to find the material discoverable under the above Rule, and the following colloquy ensued:

> MR. BARRETT: Clearly a tape recording of the conversation between two of the State's key witnesses, Renee Valelntine [sic] and Earl Kinard [sic] would fall within the purvue [sic] of Rule 16, under Section C....
>
> THE COURT: And so what do you suggest as a remedy?
>
> .    .    .    .    .
>
> MR. BARRETT: I would suggest that the State go ahead and directly examine Renee Valentine. I don't know the length of the tape, but if we would be given an opportunity similar to a jinks [sic] situation, to review the tape before I cross-examine Renee Valentine.

On appeal, the defendant insists that the trial court erred in refusing to apply Tennessee Rules of Criminal Procedure 26.2(a) and (d),[4] rather than Rule 16(a)(1)(C) as the defendant had suggested at trial. Since

---

**4.** (a) Motion for Production. After a witness other than the defendant has testified on direct examination, the trial court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and his attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.

(d) Recess for Examination of Statement. Upon delivery of the statement to the moving party, the court, upon application of that party, may recess proceedings in the trial for the examination of such statement and for preparation for its use in the trial.

the trial court followed the exact procedure the defendant requested, he has no basis to complain.

In our painstaking review of the record before us, we have uncovered no error that requires reversal. Accordingly, we affirm the judgment.

WADE and TIPTON, JJ., concur.