# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### April 24, 2001 Session

## HERSHELL LEE KINNAIRD v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Putnam County
### No. 88-0572     Leon Burns, Jr., Judge

---

### No. M2000-00037-CCA-R3-PC - Filed August 7, 2001

---

The Defendant, Hershell Lee Kinnaird, was convicted by a jury in 1989 of accessory before the fact to first degree murder[1] and conspiracy to commit first degree murder.[2]  He was sentenced to life imprisonment for the former conviction and to a concurrent ten year term for the latter conviction. The Defendant's convictions were affirmed on direct appeal. See State v. Kinnaird, 823 S.W.2d 571, 572 (Tenn. Crim. App. 1991).  In this post-conviction proceeding the Defendant contends that the State violated his constitutional rights by withholding exculpatory evidence; that the post-conviction court erred by not granting his motion for state-funded experts; that he received ineffective assistance of counsel at trial; and that the trial court committed several instances of plain error violating his right to a fair trial and/or due process.  Finding the Defendant's allegations to be without merit, we affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

DAVID H. WELLES, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Henry D. Fincher, Cookeville, Tennessee, for the appellant, Herschell Kinnaird.

Paul G. Summers, Attorney General and Reporter; Glen C. Watson, Assistant Attorney General; Bill Gibson, District Attorney General; and David Patterson, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] See Tenn. Code Ann. § 39-1-301, -302 (1982).

[2] See Tenn. Code Ann. § 39-1-604 (1982).

**OPINION**

This case presents us with an interesting procedural history. Following this Court's affirmance of his convictions on direct appeal, the Defendant filed in 1992 a petition for writ of error coram nobis on two grounds: that newly discovered evidence demonstrated that one of the State's key witnesses testified falsely at trial and that the State withheld exculpatory evidence prior to trial in violation of Brady v. Maryland, 373 U.S. 83 (1963). After an evidentiary hearing the trial court denied relief. Upon the Defendant's appeal this Court affirmed the lower court's denial of relief. See State v. Hershell Kinnaird, No. 01C01-9404-CC-00149, 1995 WL 382612, at *1 (Tenn. Crim. App., Nashville, June 28, 1995).

In 1994 the Defendant filed a petition for post-conviction relief alleging, inter alia, that he had received ineffective assistance of counsel at trial. Upon counsel being appointed to represent the Defendant in his post-conviction proceeding, an amended petition was filed, adding as grounds for relief that the State withheld exculpatory evidence at trial in violation of Brady v. Maryland and that the trial court committed several instances of plain error entitling him to a new trial. After an evidentiary hearing at which the Defendant, one of the State's prosecutors at trial, and the Defendant's defense lawyer testified, the post-conviction court denied relief. This matter is now properly before us. However, before we address the issues before us, a brief review of the facts adduced at trial will be helpful.

On July 13, 1988, the Defendant's wife and the victim in this case, Pamela Kinnaird, was stabbed to death as she sat in her car at the parking lot of the Cookeville Mall. The police subsequently arrested Donnie Ray Nelson, the Defendant's uncle, and Nelson confessed to the murder. At the time of his arrest, Nelson had a deep cut on one of his hands. In a July 16, 1988 statement he gave to Detective Robert Lynch, Nelson explained his actions:

> I went to the Cookeville Mall. I saw Pam's car and pulled in behind her. I got out of my car and walked up to the driver's side of her car. I started talking to her. I gave her my earring and told her "I loved her." She told me I was a fool and threw the earring away and said she didn't love me. I went back to my car and got my knife. I went back to her car and started stabbing her and telling her I loved her.

At trial Nelson contradicted this statement and claimed that he murdered the victim at the Defendant's request. The Defendant, he testified, had agreed to pay him $3,000 for the murder. Nelson admitted that the State had agreed not to seek the death penalty against him if he pled guilty to the murder and testified against the Defendant. He claimed not to remember how he cut his hand.

The State established that, a few months prior to her murder, the victim had requested a lawyer to prepare a divorce complaint. A few weeks before her murder, the victim applied for a $100,000 life insurance policy naming the Defendant as beneficiary; this policy was in effect at the time she was killed.

Kelly Averitt testified that he started working with the Defendant's brother, Earl Kinnaird, in March 1988. Averitt and Earl became friends. In May, Averitt testified, Earl asked him if he "knew of anyone who could make a hit on somebody" because his brother (the Defendant) was interested. Averitt replied that he did not know anyone in that line of work. Later that month, Averitt met the Defendant, and the Defendant asked him if he "knew of anybody who could pull a hit off on somebody and make it look like an accident." Averitt testified that the Defendant asked him to find someone, and Averitt said he "could call somebody." According to Averitt, the Defendant kept asking if he had found anyone to make the hit. When Averitt explained that he and Earl had not found anyone, the Defendant asked Averitt if he would murder the victim. Averitt replied that the Defendant "was nuts" and had no further discussions with the Defendant until after the murder.

Prior to the murder, Averitt testified, the Defendant told him that Pamela's death needed to look like an accident for the insurance to pay off and that "if everything worked out that we all could be doing pretty good because of the insurance policy." After the murder, according to Averitt, the Defendant demanded that Averitt drive Nelson out of town to Nashville, threatening Averitt if he did not do so. The Defendant told Averitt to tell Nelson to leave "a confession note apologizing to me for what he did. So it will throw all the blame off of me." The note, Averitt testified, was supposed to say that Nelson loved the victim and that if he could not have her, no one else could. Averitt testified that he did as requested, and Nelson left the note. On their way to Nashville, Nelson demanded to be let out at the Buffalo Valley exit, which Averitt did. Nelson told Averitt that the Defendant or Earl needed to come find him there that night and deliver the money that the Defendant had promised him for killing Pamela. This was the last time Averitt saw Nelson.

Tanya Valentine, who dated Earl for a few weeks, testified that she met the Defendant through Earl. She stated that in May, the Defendant asked her to kill Pamela, offering her $3,000 to $4,000. He wanted it done with a knife, she said, and wanted Pamela killed because she would get everything he had if she divorced him.

Jonathan Kaye met the Defendant in early July while the Defendant and Earl were installing siding on Kaye's house. After the Defendant and Earl had been at the house several days, Kaye testified, the Defendant asked him if he knew anyone who would kill someone for money, explaining that he had a friend who needed someone killed. Kaye testified that he was "stunned" by the question and "emphatically" told the Defendant, "no." Kaye said that the Defendant then made a comment like, "I think a guy has the right to kill somebody if they want to." Kaye's wife, Barbara Ann Kaye, testified that on one occasion when she told her husband in front of the Defendant that lunch was ready, the Defendant said that "the next time he got married he wanted to make sure that his wife could cook."

David Barlow, who supervised the Defendant's work at the Kayes' house, testified that the Defendant asked him if he knew anyone who would kill someone, stating that he was asking for a friend.

Earl Kinnaird testified that, beginning in May, the Defendant repeatedly asked him if he knew anyone who would kill Pamela. According to Earl, the Defendant suspected his wife of having an affair and thought that she was not a good mother. Earl explained that the Defendant wanted someone else to kill Pamela and that he wanted it to look like a robbery or an accident, so that he would have an "alibi."

Earl explained that Nelson arrived in town a few days before the murder. Nelson asked Earl to buy him a hunting knife, which Earl did. On the evening of the murder, Earl found Nelson sitting in his car at Earl's apartment and noticed that Nelson's hand was cut. Nelson told Earl that he had killed Pamela with the knife Earl had bought. Nelson wanted to ditch his car because he thought he had been seen. Accordingly, Earl followed Nelson to an area where Nelson abandoned his car. The two men then went to Center Hill Dam where Nelson threw the knife and the clothes he had worn into the lake.

Matthew Wayne Martin testified that he was working at a restaurant near the mall when he heard a woman scream. When he looked over at the parking lot, he saw a man outside the driver's door of the woman's car. He testified that "it looked like they was [sic] scrambling, or something with each other, and I seen her arms go up like this and stuff, and I seen him run to his car." Martin took down the license plate number of the car the man got into. The car belonged to Nelson.

Debra Griffey testified on behalf of the Defendant, explaining that she had been in jail with Nelson. She testified that Nelson told her he had not killed Pamela, but had been present during the murder and tried to stop it. He did not tell her who the murderer was. Nelson told Griffey that he had agreed to take the blame for the crime because "there had been too many people hurt throughout his family, and that . . . he could go to the penitentiary and do easy time."

Thomas Ralph also testified on behalf of the Defendant. He had also been in jail with Nelson. Ralph testified that Nelson told him he had not killed Pamela, that Earl had. According to Ralph, Nelson explained that the Defendant, Pamela and Earl had gone to Atlanta together. While there, Earl "ripped off" three kilos of cocaine from some drug dealers. When Pamela discovered this, she decided to turn the drugs over to the authorities. Earl told Nelson that Nelson could have one-half of the cocaine if he would kill Pamela. Nelson and Earl met Pamela at the mall, on her way to turn in the cocaine. They tried to talk her out of her plan to turn the cocaine in, to no avail. Nelson was supposed to kill her but became scared. Nelson told Ralph that Earl finally took the knife and killed Pamela. The two then left in Nelson's car and hid the cocaine. Earl told Nelson that they could make the murder look as though the Defendant had planned it. Ralph testified that Nelson did not tell him where the cocaine was hidden.

## EXCULPATORY EVIDENCE

In this post-conviction proceeding, the Defendant alleges that the State violated his constitutional rights under Brady v. Maryland when it withheld the following evidence from him prior to trial:

1. The existence of, and statement from, eyewitness Beau Rozas;

-4-

2. Two other eyewitnesses' initial identification of someone other than Nelson as the murderer;

3. Blood tests and fingerprint analyses of the car in which the victim was murdered; and

4. A pretrial statement made by Nelson which was inconsistent with his trial testimony.

The Defendant argues that all of this evidence is exculpatory because it casts doubt on Nelson as the assailant and thus on his role in soliciting Nelson to commit the murder.

Under Brady v. Maryland, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87. Evidence which is favorable to an accused includes proof which may be used to impeach the prosecution's witnesses. State v. Copeland, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998) (citing Giglio v. United States, 405 U.S. 150 (1972)). However, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985).

Thus, a defendant must satisfy the following four prerequisites in order to demonstrate a due process violation under Brady v. Maryland:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). The defendant has the burden of proving a Brady violation by a preponderance of the evidence. Id. "The key to proving a constitutional violation is to show that the omission is of such significance as to deny the defendant the right to a fair trial." Id.

The Defendant initially raised the issue regarding Beau Rozas and his statement in his motion for new trial. The record before us contains a transcript of the hearing on that motion, and a copy of the Rozas statement was made an exhibit to the hearing. In pertinent part, the statement reads as follows:

I heard a lady screaming. I looked over to my left, then back to the blue or black car in front of me. I saw a male, white, about 5'9" with light brown, straight shoulder length hair, struggling with a female in the blue or black IROC. I stepped up a few feet. Then I saw the male with his right hand behind the female's head with his left hand he was stabbing the female with what looked like a kitchen butcher knife. He stabbed her several times before I ran into the mall to get help.

Defense counsel argued at the new trial hearing that, "Nelson is smaller than five foot nine and . . . the hair, . . . the shoulder length brown hair is consistent with Earl Kinnaird rather than Donnie Nelson." After hearing considerable argument from defense counsel and the State, the trial court ruled,

[T]he statement from Mr. Rozas doesn't appear to me [to be] sufficiently exculpatory to justify a new trial. In the first place, . . . the statement indicates that [Rozas] saw the assailant in the car and then undertook to tell how tall he was. I don't think you could very successfully estimate height under those circumstances, but I'm not sure the discrepancy in height between Earl Kinnaird and Donnie Nelson is substantial anyhow.

. . .

[W]e've had both Donnie Nelson and Earl Kinnaird in the courtroom. There's not more than an inch or inch-and-a-half difference in their heights anyhow, and their build is similar. Moreover, [the prosecutor] has stated that it's his information that Donnie Nelson is the one who had long hair,[3] all of which suggests the description could very well be Donnie Nelson, not Earl Kinnaird.

Thus, the original trial court in this case made specific findings with respect to the exculpatory nature of the Rozas statement and ruled that the State's withholding of the statement did not justify a new trial under Brady. The Defendant did not pursue this issue on direct appeal.[4]

Despite his prior unsuccessful attempt to obtain relief on this issue, the Defendant again complained about the State's failure to disclose either Rozas' existence or his statement in his petition for writ of error coram nobis. The coram nobis court properly found that this issue had been previously raised in the motion for new trial and that relief under the coram nobis statute was therefore not available: "The relief obtainable by [a writ of error coram nobis] shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or

---

[3]At trial, Nelson admitted that he cut his hair after committing the murder.

[4]The Defendant claimed on direct appeal that the State had failed to disclose a witness "who had observed a bearded man stab the victim." Kinnaird, 823 S.W.2d at 574. Rozas' statement makes no reference to the assailant being bearded.

in a habeas corpus proceeding." Tenn. Code Ann. § 40-26-105 (emphasis added).[5] On appeal from the coram nobis court's ruling, this Court also rejected the Defendant's <u>Brady</u> claim on this issue, holding that "[c]oram nobis is not a forum for the determination of a constitutional issue." <u>Kinnaird</u>, 1995 WL 382612, at *4.

The Defendant now argues that his <u>Brady</u> claim regarding the Rozas statement was not previously determined in the error coram nobis proceedings. We agree. As set forth above, this Court has already held that a petition for a writ of error coram nobis is not the appropriate remedy by which to seek relief from constitutional errors such as that asserted under <u>Brady v. Maryland</u>. <u>See also</u> <u>Jeffrey Scott Miles v. State</u>, No. 03C01-9903-CR-00103, 2000 WL 2647, at *2 (Tenn. Crim. App., Knoxville, Jan. 4, 2000) (noting that a claim alleging constitutional due process error "does not qualify for relief in the form of a writ of error coram nobis"). Rather, a petition for writ of error coram nobis is appropriate where, for instance, a convicted defendant learns after trial of evidence not previously available, such as trial testimony which is subsequently recanted:

> Upon a showing by the defendant that [he or she] was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Tenn. Code Ann. § 40-26-105.

Thus, the purpose of the error coram nobis remedy "is to bring to the attention of the [trial] court some fact unknown to the court, which if known would have resulted in a different judgment." <u>State ex rel. Carlson v. State</u>, 407 S.W.2d 165, 167 (Tenn. 1966). Examples of subsequently or newly discovered evidence appropriate for a coram nobis proceeding would therefore include recanted testimony or a confession by the actual offender made after the defendant's trial. The writ is not designed to address <u>Brady</u> violations: hence, the statute contains no requirement that the State withheld or suppressed the subsequently or newly discovered evidence. <u>Brady</u> violations are constitutional violations: the appropriate remedy is therefore a post-conviction proceeding. <u>See</u> Tenn. Code Ann. § 40-30-105 (1990) (repealed 1995) ("Relief [by post-conviction procedure] shall be granted when the conviction or sentence is void or voidable because of the abridgement in any way of any right guaranteed by the constitution of this state or the Constitution of the United

---

[5] This Court has subsequently held that this list of exclusions includes matters which could have been litigated in post-conviction proceedings. <u>See</u> <u>State v. Doyle Hart</u>, No. 02C01-9612-CC-00451, 1997 WL 563613, at *6 (Tenn. Crim. App., Jackson, Sept. 10, 1997); <u>see also</u> <u>Kenneth C. Stomm v. State</u>, No. 03C01-9110-CR-00342, 1992 WL 97081, at *1 (Tenn. Crim. App., Knoxville, May 12, 1992) ("The [coram nobis] proceeding is confined to errors outside the record and to matters which were not and could not have been litigated at trial, the motion for new trial, appeal, or upon post-conviction petition."); <u>State v. James D. "Sonny" Yarbrough</u>, No. 01C01-9001-CC-00012, 1990 WL 109107, at *2 (Tenn. Crim. App., Nashville, Aug. 3, 1990) (noting that the remedy of error coram nobis is also not available on matters that were or could have been litigated in a post-conviction proceeding).

States").[6]  As previously noted, matters appropriate for post-conviction relief -- such as <u>Brady</u> violations -- are not appropriate for coram nobis proceedings.

Thus, we agree with the Defendant that his claim of a <u>Brady</u> violation arising from the State's withholding of the Rozas statement (and Rozas' very existence) was not previously determined in the coram nobis proceeding.  That is not to say, however, that the claim has not been otherwise previously determined.  We conclude that the trial court's ruling on the motion for new trial with respect to the Rozas statement renders this issue "previously determined" within the context of this post-conviction proceeding.  "A ground for relief [in a post-conviction petition] is 'previously determined' if a court of competent jurisdiction has ruled on the merits after a full and fair hearing." <u>Id.</u> § 40-30-112(a) (repealed 1995).  A "full and fair hearing" which is sufficient to support a finding of previous determination occurs if the petitioner was given the opportunity to present proof and argument on his or her claim.  <u>See</u> <u>House v. State</u>, 911 S.W.2d 705, 711 (Tenn. 1995).  Clearly, the Defendant was given the opportunity to present both proof and argument concerning the Rozas statement at the hearing on his motion for new trial.  The trial court then ruled on the merits of the Defendant's claim, finding that the Rozas statement was not exculpatory within the meaning of <u>Brady v. Maryland</u>.  The Defendant chose not to raise this issue on direct appeal, thereby rendering the trial court's ruling final.  Accordingly, we find that this issue has been previously determined by the original trial court and is not subject to further review by this Court.

Even if this issue was properly before us, we would find it to be without merit.  In spite of the trial court's previous determination of the significance of the Rozas statement at the hearing on the Defendant's motion for new trial, the post-conviction court also heard proof and issued a ruling on whether the State's failure to disclose the statement prior to trial constituted a <u>Brady</u> violation.  The post-conviction court found that "the Rozas statement would not have made that much difference in the case. . . .  It's not a reasonable probability that it would have changed the results."  We agree.  Rozas was not available to testify at either the trial, the hearing on the motion for new trial, the hearing on the Defendant's petition for writ of error coram nobis, or the post-conviction hearing.[7]  It is impossible to determine the identity of the assailant from the statement alone, but it certainly does not rule out Donnie Nelson as the perpetrator.[8]  The Defendant has failed to prove by a preponderance of the evidence that the statement was both favorable and material.  Accordingly, the State was not required to disclose the statement under <u>Brady v. Maryland</u>, and this issue is therefore without merit.

---

[6]The current post-conviction statute contains substantially the same language. <u>See</u> Tenn. Code Ann. § 40-30-203.

[7]The State was unable to locate Rozas after he gave his statement.  The Defendant argues that, had the State disclosed Rozas' existence to him prior to trial, he might have succeeded where the State failed.  Under <u>Brady</u>, it remains the Defendant's burden to prove the materiality of the evidence he claims was withheld.  Without some additional proof that Rozas would have identified someone other than Nelson as the murderer, the Defendant has simply failed in this task.

[8]It remains highly speculative whether the Defendant could have even used the Rozas statement at trial.  Rozas was apparently a "fugitive from justice" and became unavailable after he gave his statement.  The statement itself is clearly hearsay. <u>See</u> Tenn. R. Evid. 801.  Hearsay is generally inadmissible. <u>Id.</u> 802.

We turn now to the Defendant's remaining Brady claims. These issues were not raised in prior proceedings and are therefore ripe for our review.

The Defendant asserts that Matthew Martin identified someone other than Nelson from a photographic line-up he was shown by the police. A police report admitted at the post-conviction hearing states,

> When the subject (Matthew Wayne Martin) was shown the photos, his first reaction was to put his finger on photo number three [Nelson] and say, "This is him. It looks just like him." The subject was asked to have a seat and when he sat down he asked to see the photo spread again. He then looked at it and said, "No, this is him," pointing to number two. Subject then said, "Number two and number three look just alike."

The Defendant contends that this information should have been disclosed and that it would have greatly assisted him in impeaching Martin's testimony.

We respectfully disagree that this information was exculpatory within the meaning of Brady. Martin's testimony at trial was limited to describing the struggle he witnessed and identifying the license plate number of the car in which he saw the assailant leaving. Martin did not describe the assailant or otherwise identify him as Donnie Nelson. Moreover, this Court has examined the photographic line-up, and the men in photographs numbered two and three resemble each other very closely: the two photographs could easily be mistaken as being of the same man. Thus, we are confident that, even had this information been disclosed prior to trial, it would not have made any difference in the eventual verdict. Indeed, defense counsel testified at the post-conviction hearing that he did not view Martin as a "super-significant State's witness."[9]

The Defendant also complains that the State did not disclose to him the results of certain tests the Tennessee Bureau of Investigation (TBI) conducted on the car in which the victim was murdered. The TBI tested the car for fingerprints and the presence of Nelson's blood, theorizing that he cut his hand during the attack. The tests revealed neither blood nor fingerprints matching Nelson's. Thus, the Defendant argues, this information was exculpatory and should have been disclosed.

The post-conviction court found with respect to the test results,

> [T]he fact that there was no blood there, we don't know that there should have been blood there. It might have been helpful to have known that there was not blood found but it would not have made any difference in the case in my opinion. There's not a reasonable probability that it would have made any difference based on the

---

[9]The Defendant makes the same argument regarding Martin's co-worker, Derrick Bilbrey, who also witnessed the attack and identified the assailant as number two in the photographic line-up. This witness did not testify at trial, and our holding is the same with respect to the exculpatory nature of this witness's misidentification of the assailant from the line-up.

whole, the entire record. That would be on either the blood or the fingerprints or handprints or whatever.

We agree with the post-conviction court. Had the tests revealed blood and/or fingerprints of another suspect, the results would certainly have been exculpatory. However, the test results were inconclusive: they did not prove that Nelson committed the murder, but certainly did not rule him out as the perpetrator. The Defendant has thus failed to carry his burden of proving that this evidence was material under Brady.

The final piece of evidence which the Defendant contends the State wrongfully withheld is an alleged pre-trial statement made by Nelson to Detective Lynch. The "statement" consists of some notes handwritten by Detective Lynch. However, Detective Lynch did not testify at the post-conviction hearing about the circumstances under which he wrote these notes; thus, it is impossible to determine when the notes were made or the source of the information contained in them. These notes state, in pertinent part, "Defendant Nelson did not do it -- does not know who did it but he saw the man." The notes continue as if recording what Nelson said: "[He] park[ed] near her car [at the mall] . . . and was fiddling with radio -- heard a woman scream -- went to help -- saw a man -- wrestled with man -- man dropped the knife[.] Donnie bends over to pick up knife -- the man runs -- Donnie is standing there holding knife -- people see him -- Donnie runs." The notes also contain a quote attributed to Nelson, "[I]f I'd done it I'd use the gun."[10] The Defendant contends that these notes would have greatly assisted him in cross-examining Nelson and establishing that Nelson was not the murderer and, hence, that he did not hire Nelson to kill his wife.

The post-conviction court ruled,
> Some detective writes Nelson did not do it, and I don't see how that could have made any difference in the case to cross-examine him about it. We don't know when that was written. We don't know how it was written or why it was written. We don't know that it is attributable to a statement by . . . Nelson . . . or how it got there. So in my opinion it is not exculpatory information that should have been disclosed.

We agree. Defense counsel vigorously cross-examined Nelson about whether he in fact murdered the victim and put on two witnesses who testified that Nelson had told them that he did not commit the crime. Nelson was thoroughly impeached with another prior inconsistent statement. While defense counsel might have used this information to advantage during the cross-examination of Detective Lynch, we can only speculate as to how helpful this information might have been

---

[10]Nelson testified at trial that the Defendant gave him a pistol in conjunction with his attempts to solicit Nelson to murder Pamela.

because Detective Lynch did not testify at the post-conviction hearing. In short, the Defendant has failed to establish by a preponderance of the evidence that this alleged "statement" was material.[11]

In summary, the Defendant has failed to establish that the State violated his constitutional rights under Brady v. Maryland, and this issue is therefore without merit.

### DENIAL OF REQUEST FOR EXPERTS

The Defendant moved the post-conviction court to appoint a psychologist or psychiatric expert; a private investigator; and a criminal defense expert. The Defendant argued that he needed these experts to assist him in establishing his claims of ineffective assistance of counsel. The post-conviction court denied the Defendant's motion, and the Defendant now claims that ruling was in error. We respectfully disagree.

Our supreme court has made clear that "the state is not required to provide expert assistance to indigent non-capital post-conviction petitioners." Davis v. State, 912 S.W.2d 689, 696-97 (Tenn. 1995). The Defendant tries to circumvent the impact of this decision by arguing that we should consider his case a "capital case" because the State allegedly announced its intention to seek the death penalty at some time prior to the original trial. Whether or not the State did so,[12] at the time the Defendant was actually tried, the State was not seeking the death penalty. The Defendant's trial was not a "capital case," and this issue is without merit.

### INEFFECTIVE ASSISTANCE OF COUNSEL

The Defendant contends that his trial lawyers were ineffective because they failed to request a psychological evaluation; failed to request a change in venue; failed to file motions in limine on certain evidence; performed inadequately on jury voir dire; failed to object to certain evidence; failed to adequately cross-examine the State's witnesses; failed to allow the Defendant to testify; failed to object to the jury taking an overnight break between closing argument and jury deliberations; failed to request certain jury instructions; and failed to request that the jury be polled. The Defendant contends that his lawyers' errors were so profound as to entitle him to a new trial. We disagree.

Both the Sixth Amendment to the United States Constitution and Article I, § 9 of the Tennessee Constitution guarantee a defendant the right to representation by counsel. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to counsel includes the right to effective counsel. See Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936; Strickland v. Washington, 466 U.S. 668, 686 (1984).

To determine whether counsel provided effective assistance at trial, the court must decide whether counsel's performance was within the range of competence demanded of attorneys in

---

[11]The Defendant has also failed to prove that it was favorable. Detective Lynch's notes also contain the following narrative: "[Hershell] told Nelson he wanted W killed, he had hired a pro -- who had agreed to kill -- but delayed. [Hershell] asked Nelson to do it for $3000 -- offered $5000 if done w/i 2 days."

[12]The record before us contains no support for this assertion.

criminal cases. Baxter, 523 S.W.2d at 936; Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). To succeed on a claim that his or her counsel was ineffective at trial, a defendant bears the burden of showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed under the Sixth Amendment and that the deficient representation prejudiced the defendant resulting in a failure to produce a reliable result. Strickland, 466 U.S. at 687; Burns, 6 S.W.3d at 461; Hicks, 983 S.W.2d at 245. To satisfy the second prong, the defendant must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the defendant's guilt. See Strickland, 466 U.S. at 694-95. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994); Owens v. State, 13 S.W.3d 742, 750 (Tenn. Crim. App. 1999).

When reviewing trial counsel's actions, this Court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); Owens, 13 S.W.3d at 749. Counsel's alleged errors should be judged at the time they were made in light of all facts and circumstances. See Strickland, 466 U.S. at 690; Hicks, 983 S.W.2d at 246.

The post-conviction court made extensive findings with respect to each of the Defendant's allegations regarding his lawyers' trial performance and found no unreasonable errors. We agree with the post-conviction court's findings. Our careful review of the trial transcript reveals competent defense representation and valid strategy decisions. The Defendant wishes to retry his case because he was found guilty, not because his lawyers failed to adequately represent him. The Defendant having failed to carry his burden of proving that his lawyers committed unreasonable errors that prejudiced him to the extent required for relief under Strickland, this issue is without merit.

## OTHER TRIAL ERRORS

The Defendant contends that the original trial court committed the following plain errors entitling him to a new trial:

1. Refusing to admit proof explaining the Defendant's escape from jail and subsequent voluntary surrender;

2. Admitting proof of Thomas Ralph's juvenile adjudications;

3. Refusing to admit certain of the Defendant's hearsay statements;

4. Holding that tape recordings of telephone conversations between Earl Kinnaird and Renee Valentine were not discoverable; and

5. Refusing to grant a mistrial upon a State's witness's reference to the Defendant's escape from jail.

The Defendant additionally complains that the State's failure to disclose that the jury foreman had previously testified in a criminal case against Thomas Ralph constituted plain error.

The Defendant's allegations concerning the trial court's rulings on his motion for mistrial and on the tape recorded conversations were submitted to this Court on direct appeal and determined to be without merit. See Kinnaird, 823 S.W. 2d at 574-76. These issues have therefore been previously determined and are not cognizable in this proceeding. See Tenn. Code Ann. § 40-30-112(a) (1990) (repealed 1995). The Defendant also raised in his motion for new trial and his direct appeal the issue concerning the jury foreman's prior testimony against Thomas Ralph. The foreman, David Bowman, had been the manager of a market that Thomas Ralph was prosecuted for robbing. Mr. Bowman testified about the amount of money stolen; he was apparently not present in the store at the time of the robbery. At the hearing on the motion for new trial, defense counsel stated his concern that Mr. Bowman's personal judgment of the Defendant's case was adversely affected by his prior involvement in Mr. Ralph's case. Defense counsel did not argue that Bowman's prior history prejudiced the other jurors. During a recess at the hearing, defense counsel was given the opportunity to speak with Mr. Bowman about the effect, if any, his prior testimony had on his deliberations in the Defendant's case. Defense counsel subsequently stated to the trial court, "[Bowman] indicated that his verdict was not at all influenced by the fact that he had testified as to an amount of money and that [neither] his verdict nor anyone else's verdict was influenced by the fact that he had testified to that limited extent." The trial court accordingly refused to grant a new trial on this basis. On direct appeal, this Court was unable to reach this issue on the merits because of an inadequate record. See Kinnaird, 823 S.W.2d at 574. It is the Defendant's responsibility to provide a complete record on appeal, see Tenn. R. App. P. 24(a),(b), and the Defendant certainly could have provided in his direct appeal to this Court a transcript of the hearing on the motion for new trial, as he has done in this proceeding. The Defendant's failure to do so permits the trial court's ruling to stand as final, and this issue has therefore been previously determined. See Tenn. Code Ann. § 40-30-112(a) (1990) (repealed 1995). Moreover, we find it to be without merit. There is absolutely no proof in the record that the Defendant was prejudiced by Bowman's testimony against Ralph, and we will not presume such. The Defendant is not entitled to post-conviction relief on this ground.

The remaining issues which the Defendant contends were "plain error" could have been raised on direct appeal but were not. They have therefore been waived and we need not address them. See id. § 40-30-112(b).

The judgment of the post-conviction court is affirmed.

_____
DAVID H. WELLES, JUDGE